Cecil C. BASSETT and Doris J. Bassett, Respondents,

v.

FEDERAL KEMPER INSURANCE COMPANY, Appellant.

No. KCD 29079.

Missouri Court of Appeals, Kansas City District.

May 1, 1978.

Appellant sold the policy through its agent, Don Ireland, in December, 1974. The Bassetts arranged with Ireland to pay the premium on a monthly basis, and it was financed by appellant through National Agents Service Company (NASCO), all of the communications being through Ireland to NASCO. The van was added to the policy in January, 1975, and on July 27, 1975, Cecil Bassett's brother was added to the coverage, but the bill for October, 1975, was for a six month premium, $103.62, rather than for a little over one month, the brother's coverage being deleted September 1, 1975. On advice of Ireland, respondents paid $26.14. The bill for November, 1975, was again $104.40, including a $2.35 finance charge, and after consulting Ireland, respondents, according to exhibits, including credits for removing the brother from coverage, paid these additional premiums: 11–16–75, $46.27; 12–1–75, $30.00; 12–16–75, $26.87; 12–30–75, $26.50. A computation of total charge, total payments and total credits, shows that there is still owed to respondents $26.87 by appellant.

On November 25, 1975, the collision occurred and Ireland was notified that night and he told Mrs. Bassett to get the medical bills and three estimates, which she did, thereafter taking them to Ireland. In early December, 1975, Walter Jones, the adjuster, directed respondents to take the van to Detweiler's Auto Service and Body Shop, which they did. On January 12, 1976, Mrs. Bassett inquired of Ireland why they had not received a check for the repair of the van, and while she was in his office, he called appellant, and then told her a check had already been mailed to the body shop. The following week respondents received a letter dated January 13, 1976, from appellant notifying them that their insurance had been cancelled as of *November 4, 1975* [which date was *prior* to the time of the collision, the notification being made *after* that time.]. On January 17 or 18, 1976, Mrs. Bassett contacted Ireland, who again called appellant, and informed her that the check was on the way, but that their insurance was cancelled. The check was received by the body shop before respondents

Wiley W. Morrison, Raytown, for appellant; Morrison, Baker & Odneal, Raytown, of counsel.

Ronald E. Taylor, St. Joseph, for respondents.

Before WELBORN, Special Judge, Presiding, HIGGINS, Special Judge and PRITCHARD, J.

PRITCHARD, Judge.

One dispositive issue is whether appellant is liable for respondents' loss for collision loss to their van under a policy of insurance where the policy was cancelled by the appellant company retroactively prior to the collision by notice given by a premium finance company acting under insureds' power of attorney for nonpayment of premium, which notice was given to appellant after the collision occurred. Another question is whether appellant is liable for damages for vexatious delay in the payment of the loss under § 375.420, RSMo 1969 (Amended, Laws 1975, p. 369, H.B.No. 93, § 1).

were allowed to take possession of the van, which was delivered to them about the first of February. Mrs. Bassett saw the check at the body shop, but appellant refused to accept it on presentment.

Shortly after respondents got the van from Detweiler, the paint began peeling off and Mr. Bassett took it back to the body shop. When he returned with the van, the owner of the shop then blocked it with another car and refused to let him remove it, demanding payment for the previous repairs. At the time, because Mr. Bassett had no other vehicle, he could not get to work, and as a result he lost $56.00 in wages. He also incurred $11.00 for costs in filing a replevin action the following week to recover the van. The owner of the body shop required respondents to pay for the repairs because appellant did not pay him, and they had to borrow the money to pay him, even though they had endorsed the check to him.

At the time NASCO financed the premiums for respondents, they gave it a power of attorney to request cancellation (of appellant) when payments were not made. Appellant's underwriting department supervisor, Dwaine Eugene Cook, testified that his department handled cancellations, and had received a copy of the finance agreement between respondents and NASCO. He also received a request to remove Mr. Bassett's brother from coverage, which was done and which resulted in a credit of $75.67, which was given to NASCO on November 20, 1975. NASCO, however, applied this credit to respondents November 16, 1975, billing [which was erroneously billed by NASCO as $104.40 instead of the regular monthly payment of around $26.14]. On December 18, 1975, appellant received a letter from NASCO requesting cancellation as of November 4, 1975, which appellant did, treating it as an insureds' cancellation under respondents' power of attorney given to NASCO.

It appears from the evidence that respondents were never actually in default in the payment of *proper* premiums through NASCO, and certainly it would seem that appel-

lant would be charged with knowledge of what a proper audit of its own records with respect to respondents' account would reveal. But any issue as to those matters is not here presented by respondents to justify the trial court's judgment.

■ Appellant's first point contention is that there is no evidence from which the trial court could conclude that the policy was not effectively cancelled prior to loss because appellant had a right or duty to accede to the request by NASCO, respondents' attorney in fact, to cancel the policy. As first stated, the real issue is: Can an insurance company cancel a policy retroactively and make cancellation effective prior to the date that a loss occurred and thus avoid liability?

The date of the loss, November 25, 1975, was known to appellant as it sent out its adjuster in early December, 1975, who authorized the repairs at Detweiler's Body Shop. Then, on December 18, 1975, it received from NASCO the request to cancel the policy under the respondents' power of attorney *as of November 4, 1975*. The real issue posed above has its answer in the following analogous cases, and, first, these excerpts bearing on the issue from Appleman, Insurance Law and Practice: § 4226, p. 660, "A request for cancellation does not take effect until received by the insurer, or by his agent authorized to receive the same. So, if a loss occurs before a notice or request for cancellation is received by the insurer, the liability of the company is not extinguished."; § 4197, p. 621, " * * * [O]bviously a cancellation would have no effect on a right of action which had previously accrued under the policy."; and § 4193, p. 597, " * * * [T]he burden of proving a valid cancellation is upon the party asserting it." See also 45 C.J.S. Insurance § 453, pp. 105, 106. And note here that the policy, here in evidence, paragraph 16 of Conditions, provides: "This policy may be cancelled by the insured named in Item 1 of the declarations by surrender thereof to the company or any of its authorized agents or by mailing to the company written notice stating that *thereafter* the

cancellation shall be effective." [Italics added.] There is nothing to show that NASCO complied with this policy provision in giving the notice of cancellation under the power of attorney.

In *Kingsland v. Missouri State Life Ins. Co.*, 228 Mo.App. 198, 66 S.W.2d 959 (1933) [overruled on other grounds, *Schuerman v. General American Life Ins. Co.*, 232 Mo. App. 352, 106 S.W.2d 920, 922[1] (1937)], a disability group policy was cancelled by the employer before a six month disability of plaintiff employee had become fixed, i. e. before the liability attached under the policy. The court, although affirming a judgment on the pleadings, observed, 66 S.W.2d 961[1–4], "To defeat liability on an insurance contract, there must be cancellation made before the liability attaches." In *Militello v. Banker's Life and Casualty Company*, 141 So.2d 454 (La.App.1962), insured was admitted to a hospital for the second time for a coronary condition at which time he was notified that the policy was being cancelled. About a year later, insured was again hospitalized for the same condition and the insurer refused to pay. The court said, 141 So.2d 457[1], "As the disability arose while the policy was in effect the subsequent cancellation could not affect a claim which had already arisen." The facts of *Detroit Auto. Inter-Insurance Exchange v. Ayvazian*, 62 Mich.App. 94, 233 N.W.2d 200 (1975), were that a father of a first-named insured was involved in a collision in February, 1972. The daughter, first-named insured, contacted the insurer about cancelling the policy. The insurer advised her that she could cancel retroactively to November 1, 1971, and get a refund of premium from November 1, 1971, to March, 1972, which she did. On the father's claim, the insurer contended that he could not recover because the daughter had cancelled the policy prior to the date of the collision. The court rejected the contention saying, 233 N.W.2d 203[3] " * * * '[S]ince coverage existed at the time the accident occurred that coverage would have continued from that moment on regardless of the subsequent acts of the parties.' " The *Ayvazian* court quoted from 1 Long, The Law of

Liability Insurance, § 3.25: " 'The liability of the insurer with respect to insurance * * * becomes absolute whenever injury or damage covered by such policy occurs. The policy may not be cancelled or annulled as to such liability by agreement between the insurer and the insured after the occurrence of the injury or damage.' "

■ In accordance with the foregoing authorities, it must be held that, because liability had attached for respondent's collision loss, the retroactive cancellation was of no effect, and appellant's assertions to the contrary are overruled.

■ Appellant next contends that the penalty for vexatious refusal to pay the loss under § 375.420 should not have been imposed, because, citing *Cox v. Washington National Insurance Co.*, 520 S.W.2d 76 (Mo. App.1974), it was not the intent of the statute to punish insurers who seek decisions in the courts on uncertain issues. Under the above cited authority [of which, appellant, being in the insurance business, must have known] to the effect that a policy may not be cancelled to avoid a pre-existing loss claim, and considering that appellant knew of the loss prior to the time it received the power of attorney notice of NASCO, the issue here cannot be uncertain. Appellant's conduct must be deemed "vexatious" under the statute as that term is defined in *Hay v. Utica Mutual Insurance Co.*, 551 S.W.2d 954 (Mo.App.1977), as meaning "without reasonable or probable cause or excuse." The contention is overruled.

■ Lastly, appellant contends that the damages awarded exceed the amount permitted by § 375.420. It is argued, without citation of authority, that the court erred in including $11.00 for replevin costs in seeking recovery of the van from the body shop (which held it after it was returned because appellant had refused to honor its draft), and $56.00 lost wages to Mr. Bassett occasioned by the body shop's detention of the van. In this argument, appellant is correct because the detention of the van was not a wrongful act of appel-

lant, but was the act of the owner of the body shop who is not a party to this action. The statute, being penal in nature, must be strictly construed, *Kay v. Metropolitan Life Ins. Co.,* 548 S.W.2d 629, 632[7] (Mo.App. 1977), and the statute provides for the damages as a penalty for refusal to pay a loss without reasonable cause or excuse, i. e., 20% on the first $1,500.00 of the loss *under the policy,* interest (not here prayed for or given by the trial court), and a reasonable attorney's fee. The statutory provision necessarily excludes other consequential or collateral damages which do not arise under the policy. The consequential or collateral damages here, totalling $67.00, were improperly included, but since, as held, damages for vexatious refusal to pay were allowable, the amount may be readily computed: $816.62 net collision loss; $115.00 medical payments, totalling $931.62, plus 20% penalty, $186.32, plus $400.00 attorney's fees, a grand total of $1,517.94.

The judgment is affirmed, except that part including $67.00 consequential or collateral damages, which is reversed, and the case is remanded with directions to enter a new judgment against appellant in the amount of $1,517.94 and for costs.

All concur.